**Electronically Filed
Supreme Court
SCWC-15-0000640
14-DEC-2017
10:05 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

In re Application of MAUI ELECTRIC COMPANY, LIMITED,
For Approval of the Amended and Restated Power Purchase Agreement
With Hawaiian Commercial & Sugar Company.

SCWC-15-0000640

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000640; PUC DOCKET NO. 2015-0094)

DECEMBER 14, 2017

McKENNA, POLLACK, and WILSON, JJ., WITH RECKTENWALD, C.J.,
DISSENTING, WITH WHOM NAKAYAMA, J., JOINS

OPINION OF THE COURT BY POLLACK, J.

Article XI, section 9 of the Hawai'i Constitution guarantees each person "the right to a clean and healthful environment, as defined by laws relating to environmental quality." Article I, section 5 provides that "[n]o person shall be deprived of life, liberty or property without due process of law." This case raises the issue of whether the protections of the due process clause apply to the right to a clean and

healthful environment as defined by laws related to environmental quality. We hold that, under the circumstances of this case, the petitioners asserted a protectable property interest in a clean and healthful environment as defined by environmental regulations; that the agency decision adversely affected this interest; and that a due process hearing was required given the importance of the interest, the risk of an erroneous deprivation, and the governmental interests involved.

## I. BACKGROUND

This case involves a power purchase agreement between Maui Electric Company, Limited ("Maui Electric"), an electric utility company,[1] and Hawaiian Commercial & Sugar Company (HC&S), a producer of electricity. Hawaii Revised Statutes (HRS) § 269-16.22, relating to power purchase agreements, allows electric utility companies to recover all power purchase costs from customers subject to the approval of the Public Utilities Commission ("Commission" or PUC).[2]

Maui Electric filed an application with the Commission on March 31, 2015 (the "Application"), seeking approval of a

---

[1] An "electric utility company" is a public utility as defined under Hawaii Revised Statutes § 269-1 "for the production, conveyance, transmission, delivery, or furnishing of electric power." HRS § 269-16.22 (Supp. 2012); see also id. § 269-1 (Supp. 2013) (defining "public utility").

[2] The Commission is responsible for the regulation of public utilities in the State. HRS §§ 269-2, 269-6 (Supp. 2013).

power purchase agreement between Maui Electric and HC&S (the "Agreement"). The Application indicated that the Agreement restated and amended an existing power purchase agreement between Maui Electric and HC&S. Maui Electric sought the Commission's approval of the Agreement, a finding that the energy charges to be incurred under the Agreement were just and reasonable, a finding that the "purchased power arrangement" under the Agreement was prudent and in the public interest, and an authorization to charge consumers for the energy costs through its existing energy cost adjustment clause.[3]

The existing agreement between the parties was approved by the Commission in 1990 and was negotiated to continue in effect through December 31, 1999, and on a year-to-year basis thereafter subject to termination. The Application noted that, if the Commission did not issue an order approving the Agreement on or before September 30, 2015, the existing agreement between the parties could be terminated by either party.

Under the existing agreement, Maui Electric had been purchasing energy produced by HC&S at its facility located in Pu'unene, Maui (the "Pu'unene Plant"). The Pu'unene Plant

---

[3] The Application also sought authorization to include the purchased energy charges in Maui Electric's revenue requirements for ratemaking purposes; however, this request was subsequently withdrawn.

consisted of a sugar processing operation with an internal bagasse-fired power plant that also burned a number of other fuels, including coal and petroleum.[4]  Under the Agreement, Maui Electric would continue to purchase energy generated at the Pu'unene Plant.  According to Maui Electric, the Agreement would, inter alia, amend the pricing structure and rates for energy purchases under the existing agreement between Maui Electric and HC&S; eliminate capacity payments Maui Electric was making to HC&S under the existing agreement; eliminate Maui Electric's existing minimum purchase obligation; and extend the arrangement between the parties from 2014 to 2017.

On April 17, 2015, Sierra Club timely filed a motion to intervene[5] or to participate without intervention[6] in the

_____

[4]     The Division of Consumer Advocacy's Statement of Position provided the following:

> The Consumer Advocate also recognizes that, even though Maui Electric refers to the [Pu'unene Plant] as an internal bagasse fired power plant, the unit burns a number of other fuels, including coal and petroleum.  The Consumer Advocate also recognizes that continued reliance on older thermal units that burn fossil fuels is not consistent with the State's goal of 100% renewable energy by 2045.

[5]     Pursuant to Hawai'i Administrative Rules (HAR) § 6-61-55(a) (1992), "[a] person may make an application to intervene and become a party by filing a timely written motion in accordance with sections 6-61-15 to 6-61-24, section 6-61-41, and section 6-61-57, stating the facts and reasons for the proposed intervention and the position and interest of the applicant."

[6]     HAR § 6-61-56, titled "Participation without intervention," provides in pertinent part as follows:

(continued . . .)

proceedings concerning the Application in order to assist the Commission in fully developing the facts and law regarding the fuel mix at the Pu'unene Plant and other matters at issue in the proceeding. Sierra Club sought intervention on behalf of itself and its members who live in close proximity to the Pu'unene Plant. In its motion, Sierra Club asserted a fundamental due process right to participate in a hearing on the grounds that the Agreement would impact Sierra Club's members' health, aesthetic, and recreational interests. Sierra Club also asserted its organizational interest in reducing Hawaii's dependence on imported fossil fuels and advancing a clean energy grid.

Sierra Club argued that its members were concerned that the Pu'unene Plant relied too heavily on coal in order to meet its power obligations under the existing agreement and also that its members were concerned "about the public health and visibility impacts of burning coal." Statistics provided by

---

(. . . continued)

> The commission may permit participation without intervention. A person or entity in whose behalf an appearance is entered in this manner is not a party to the proceeding and may participate in the proceeding only to the degree ordered by the commission. The extent to which a participant may be involved in the proceeding shall be determined in the order granting participation or in the prehearing order.

HAR § 6-61-56(a) (1992).

Sierra Club indicated that the fuel mix burned at the Puʻunene Plant for energy generation from 2010 to 2012 was comprised of approximately twenty-five per cent coal and petroleum. Sierra Club asserted that members on an ongoing basis were forced to close the windows of their homes and run air filters to protect against harmful pollution. Sierra Club also noted that the Department of Health sought to impose a fine of over one million dollars on HC&S in the previous year as a result of more than four hundred violations of the Clean Air Act.[7] Sierra Club asserted that the Puʻunene Plant was permitted to burn coal and petroleum, operated without modern pollution controls, and consistently violated limits set by the Clean Air Act. Sierra Club also contended that there was an issue of how much energy at the plant could be considered "renewable power" under HRS § 269-92(b)(4), which relates to standards that prescribe what portions of the renewable portfolio standards may be met by

---

[7] Included in the record was a "Notice and Finding of Violation" issued to HC&S by the Clean Air Branch of the Department of Health of the State of Hawaiʻi. Amongst the violations listed in the notice were violations of HAR § 11-60.1-32(b) concerning visible emissions. The Notice and Finding of Violation assessed an administrative penalty of $1,335,000.00. These alleged violations were not adjudicated in an agency proceeding as HC&S later agreed to a Consent Order settling all civil liability for the alleged violations in June 2016. Dep't of Health v. Hawaiian Commercial & Sugar Co., 14-CA-EO-01 (June 7, 2016), http://health.hawaii.gov/cab/files/2016/06/2016_06_07__No._14-CA-EO-01-HCS-CO-signed-by-DDEH.pdf. In the Consent Order, HC&S agreed to a $600,000 fine; to relinquish certain equipment, related hardware, and supplies; and to maintain air quality monitoring equipment at local schools. Id.

specific types of energy sources. Sierra Club maintained that the proceedings would determine the future obligations of the Pu'unene Plant to supply power to Maui Electric, "which is a de facto determination [of] whether the plant will continue to burn coal."

Sierra Club attached the affidavits of two of their members to the motion for intervention or participation. Clare Apana, a Wailuku resident who is able to see the Pu'unene Plant's smokestack from her home, stated the following in her affidavit:

> 4. I have concerns about the coal burning at Pu'unene. I understand that burning coal results in emissions of dangerous air pollutants such as particulate matter, sulfur dioxide, nitrogen oxides, mercury, and other toxic pollutants. I know that these pollutants can cause or contribute to a wide range of health problems, including asthma, and respiratory and cardiovascular disease.
>
> 5. I have concerns about the impacts of the pollution from the plant on my health and the health of my family. On some days, because the pollution in the area causes hazy conditions, I cannot see the mountains from my house. On these days, I will turn on my air filters and close my windows to limit my exposure.
>
> 6. I understand that the Pu'unene plant supplies power to the Maui Electric Company . . . , and that the Commission is considering approving a new power purchase agreement with the plant. I am concerned that the plant burns more coal and produces more air pollution in order to meet its obligations to supply power [to Maui Electric].
>
> 7. If the Commission decided not to approve the new power purchase agreement, it might decrease coal-burning at Pu'unene, and therefore decrease some of my concerns about the pollution from the plant. I would feel more comfortable about seeing the plume from the plant if I knew that they were not burning coal, or if they were burning less coal at the plant. It would increase my enjoyment of the area and produce other benefits to my long-term health and well-being.

The other affidavit attached to Sierra Club's motion was by Wailuku resident Christine Andrews, who also expressed concerns regarding the coal burning at the Pu'unene Plant and the potential impact of the coal burning on her long-term health. The Andrews affidavit referenced violations of limits on emissions by HC&S as follows:

> I understand that the Department of Health issued the Pu'unene plant a Notice of Violation in 2014 and a million dollar fine regarding its emissions of opacity. I understand that opacity is a measure of particulate matter pollution. I have concerns about the impacts of the pollution from the plant on my health and the health of my family. I do not want to be exposed to levels of air pollution which exceed the levels permitted by law. I am especially concerned about my exposure to [the] plant's particulate matter emissions (including the toxic substances that may be contained in particulate matter) because I know particulate matter can penetrate deep into the lungs and can lead to a range of respiratory problems.

Maui Electric filed a memorandum in opposition to Sierra Club's motion for intervention or participation asserting, inter alia, that Sierra Club failed to establish a right to participate in a hearing. Maui Electric's memorandum did not address Sierra Club's assertion of a right to a due process hearing and solely argued that Sierra Club failed to establish a statutory right to participate in the proceeding.

The Commission denied Sierra Club's motion to intervene or to participate without considering Sierra Club's due process assertion. The Commission concluded that Sierra Club did not have an interest distinct from the general public and that "its interests in environmental issues and impacts

8

could unreasonably broaden the issues already presented." The Commission further concluded that the questions and concerns of Sierra Club "fall outside the narrow issues present in the Application, which concern the pricing structure and purchase obligations" of Maui Electric and HC&S. The Commission also found that Sierra Club's involvement in other energy proceedings indicated that there were sufficient other means for Sierra Club to protect its interests.

Sierra Club subsequently filed a motion with the Commission requesting reconsideration of the order denying its motion to intervene or participate in the proceeding. Sierra Club again asserted a due process right to participate in a contested case hearing related to the Application based on the constitutionally-protected environmental rights of the organization and its members. Sierra Club cited to Pele Defense Fund v. Puna Geothermal Venture, 77 Hawai'i 64, 881 P.2d 1210 (1994), in support of its argument that a due process hearing was constitutionally required. Sierra Club also asserted that the "present proceeding" was required under HRS § 269-27.2(c).

In denying Sierra Club's motion for reconsideration, the Commission determined that Sierra Club failed to justify intervention or participation in the proceeding. With regard to Sierra Club's due process argument, the Commission determined that Pele Defense Fund was inapplicable. The Commission did not

otherwise address Sierra Club's assertion of a due process right to participate in a hearing concerning its environmental rights.[8]

The Commission issued its final Decision and Order concerning the Application on September 24, 2015. In its Decision and Order, the Commission granted the Application to approve the Agreement. Among its findings and conclusions, the Commission observed that the Agreement is "anticipated to help accomplish the State's policy goals of reaching 100% renewable energy by 2045 as well as increasing the State's energy self-sufficiency." Additionally, the Commission approved Maui Electric's request to file confidentially fuel information provided by HC&S, which includes the type of fuels burned by HC&S. The PUC determined that the information was proprietary and "if disclosed publicly could disadvantage and competitively harm HC&S."

Sierra Club appealed to the Intermediate Court of Appeals (ICA) challenging the Commission's order denying its motion to intervene or participate in the proceedings and Sierra Club's motion for reconsideration. Both the Commission and Maui Electric contested the jurisdiction of the ICA, arguing that the

---

[8] The Division of Consumer Advocacy took no position with respect to Sierra Club's motion for intervention or with regard to the motion for reconsideration. In its Statement of Position as to the Agreement, the Consumer Advocate recommended approval of the Agreement subject to various conditions.

ICA lacked jurisdiction because the appeal did not arise from a contested case. Maui Electric filed a motion to dismiss the appeal, asserting that the appeal should be dismissed for lack of jurisdiction because the motion to intervene was not a contested case proceeding. Maui Electric asserted that Sierra Club's concern regarding "the public health and visibility impacts of burning coal" did not rise to the level of property within the meaning of the due process clause. Maui Electric also argued that, as a factual matter, the Commission's approval of the Application would not increase the amount of electricity generated using coal at the Pu'unene Plant.

In its statement of jurisdiction and memorandum in opposition to Maui Electric's motion to dismiss, Sierra Club asserted that a hearing regarding the Application was required pursuant to HRS § 269-27.2(d), HRS § 269-16(b), and by due process to protect the right to a clean and healthful environment.

The ICA granted Maui Electric's motion to dismiss Sierra Club's appeal, concluding that the Commission was not required to hold a hearing on the Application, and thus, the ICA determined, Sierra Club was not "a person aggrieved in a contested case proceeding" under HRS § 269-15.5. Accordingly, the ICA concluded that it was without appellate jurisdiction to consider Sierra Club's appeal. The ICA relied on In re Tawhiri

11

Power LLC, 126 Hawai'i 242, 245-46, 269 P.3d 777, 780-81 (App. 2012), in noting that appellate jurisdiction does not exist over appeals based on a Commission order denying a motion to intervene.[9]  Sierra Club subsequently filed an application for a writ of certiorari to this court, which was granted.

## II. DISCUSSION

### A. Mootness

Maui Electric asserts that this case should be dismissed in light of the recent closing of the Pu'unene Plant. However, to the extent Sierra Club's claim is moot, it falls within the public interest exception to the mootness doctrine. This court reviews three factors in analyzing the public interest exception: "(1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question."  Cty. of Haw. v. Ala Loop Homeowners, 123 Hawai'i 391, 405, 235 P.3d 1103, 1117 (2010) (quoting Doe v. Doe, 116 Hawai'i 323, 327, 172 P.3d 1067, 1071 (2007)).

---

[9]     The ICA also cited to In re T-Mobile West Corp., No. CAAP-12-0001117, 2013 WL 1501028 (App. Apr. 11, 2013) (order granting motion to dismiss appeal), and In re Coral Wireless, No. CAAP-12-0001119, 2013 WL 1729717 (App. Apr. 22, 2013) (order dismissing appeal).

The issue in this case is whether, given the circumstances presented, due process under the Hawai'i Constitution provides procedural protections to persons asserting the constitutional right to a clean and healthful environment. Resolution of the issue may affect similarly situated parties who in the future seek to assert their right to a clean and healthful environment in proceedings before agencies and other governmental bodies. Ala Loop, 123 Hawai'i at 405, 235 P.3d at 1117 ("[T]he ICA's ruling that there is no private right of action under chapter 205 'inject[ed] the requisite degree of public concern' in support of having the public interest exception apply." (quoting Doe, 116 Hawai'i at 327, 172 P.2d at 1071)); Hamilton ex rel. Lethem v. Lethem, 119 Hawai'i 1, 7, 193 P.3d 839, 845 (2008) (noting that "the public interest exception has focused largely on political or legislative issues that affect a significant number of Hawai'i residents"); Kaho'ohanohano v. State, 114 Hawai'i 302, 333, 162 P.3d 696, 727 (2007) (holding that the question in the case was of a public nature because the outcome would affect all state and county employees); Doe, 116 Hawai'i at 327, 172 P.3d at 1071 (constitutionality of a grandparent visitation statute was of a public nature).

Resolution of the issue presented in this case is also desirable because it will guide public officers, especially

13

those working for agencies that exercise quasi-adjudicative authority, as to the manner in which due process and the right to a clean and healthful environment interact and as to the procedural safeguards that may be applicable when these two constitutional rights converge.  See Ala Loop, 123 Hawai'i at 405, 235 P.3d at 1117 (reasoning that "because the availability of private enforcement is a potentially important consideration for public officers to take into account in performing their own duties under HRS chapter 205, public officials need guidance with regard to whether private citizens have a private right of action to enforce HRS chapter 205"); Kaho'ohanohano, 114 Hawai'i at 333—34, 162 P.3d at 727–28 (noting that "determination of the matter would assist public officers in the future" because it "will assist executive officers and legislators in making budgetary decisions involving the benefits of public employees").  Providing guidance in this area is desirable because it will clarify to public officers that they have the duty to properly consider and effectuate safeguards that the Hawai'i Constitution provides in the context of agency proceedings.  See Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawai'i 376, 414, 363 P.3d 224, 262 (2015) (Pollack, J., concurring) (a majority of the court holding that "an agency

. . . must perform its statutory function in a manner that fulfills the State's affirmative constitutional obligations").

Finally, given that agencies are "often in the position of deciding issues that affect multiple stakeholders and implicate constitutional rights and duties," Mauna Kea Anaina Hou, 136 Hawai'i at 413-14, 363 P.3d at 261-62, it is likely that the constitutional right to a clean and healthful environment will be asserted or will arise under agency proceedings in the future. Thus, the question that we resolve in this case is likely to recur in the future. See Ala Loop, 123 Hawai'i at 405-06, 235 P.3d at 1117-18 (reasoning that "given the volume of land development activity in the State and the frequency with which issues relating to chapter 205 have been litigated, the question regarding whether a private party may seek to enforce HRS chapter 205 is likely to recur in the future"); Kaleikini v. Thielen, 124 Hawai'i 1, 13, 237 P.3d 1067, 1079 (2010) (explaining that "the likelihood of future recurrence of the question seems high inasmuch as it seems probable that iwi will continue to be unearthed at future construction projects"). Accordingly, this case satisfies the three prongs of the public interest exception to the mootness doctrine, and we proceed to address the merits of this case.

## B. Appellate Jurisdiction

Commission decisions are appealable to the ICA pursuant to HRS § 269-15.5.[10]  "Only a person aggrieved in a contested case proceeding . . . may appeal from the order, if the order is final, or if preliminary, is of the nature defined by section 91-14(a)."  Id.  Judicial review over an agency appeal is authorized by HRS § 91-14 when the following requirements have been met:

> first, the proceeding that resulted in the unfavorable agency action must have been a contested case hearing . . . ; second, the agency's action must represent a final decision or order, or a preliminary ruling such that deferral of review would deprive the claimant of adequate relief; third, the claimant must have followed the applicable agency rules and, therefore, have been involved in the contested case; and finally, the claimant's legal interests must have been injured--i.e., the claimant must have standing to appeal.

Kilakila 'O Haleakala v. Bd. of Land & Nat. Res., 131 Hawai'i 193, 200, 317 P.3d 27, 34 (2013) (quoting Kaleikini v. Thielen, 124 Hawai'i 1, 16-17, 237 P.3d 1067, 1082-83 (2010)).[11]  In other

---

[10]    HRS § 269-15.5 provides, inter alia, as follows:

An appeal from an order of the public utilities commission under this chapter shall lie, subject to chapter 602, in the manner provided for civil appeals from the circuit courts.  Only a person aggrieved in a contested case proceeding provided for in this chapter may appeal from the order, if the order is final, or if preliminary, is of the nature defined by section 91-14(a).

HRS § 269-15.5 (2007).

[11]    HRS § 91-14(a) provides,

Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature

(continued . . .)

16

words, there are four requirements for judicial review over an agency appeal: a contested case hearing, finality, compliance with agency rule, and standing.  As the decision was final and Sierra Club complied with applicable agency rules, we consider whether there was a contested case and whether Sierra Club has standing to appeal.[12]

## 1. The Proceeding Was a Contested Case

A contested case hearing is one that is (1) "required by law" and (2) determines "the rights, duties, and privileges of specific parties."  Kilakila 'O Haleakala, 131 Hawai'i at 200, 317 P.3d at 34 (quoting Kaleikini, 124 Hawai'i at 16-17, 237 P.3d at 1082-83).  Accordingly, we address whether a hearing was

_____

(. . . continued)

> that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law.  Notwithstanding any other provision of this chapter to the contrary, for the purposes of this section, the term "person aggrieved" shall include an agency that is a party to a contested case proceeding before that agency or another agency.

HRS § 91-14(a) (2012).

[12]    We note that the standing requirement to challenge an agency action is distinct from the procedural right to do so.  As explained in County of Hawai'i v. Ala Loop Homeowners, "[t]he private right of action inquiry focuses on the question of whether any private party can sue . . . while the standing inquiry focuses on whether a particular private party is an appropriate plaintiff."  123 Hawai'i 391, 406 n.20, 235 P.3d 1103, 1118 n.20 (2010).

required by law and, if required, whether such a hearing would have determined the rights, duties, and privileges of specific parties.

"In order for an administrative agency hearing to be 'required by law, it may be required by (1) agency rule, (2) statute, or (3) constitutional due process.'" Id. (quoting Kaleikini, 124 Hawai'i at 16–17, 237 P.3d at 1082–83). Sierra Club asserts that a hearing was required in this matter under HRS § 269-27.2(d);[13] HRS § 269-16(b);[14] and under the due process clause of article I, section 5 of the Hawai'i Constitution.[15]

_____

[13] HRS § 269-27.2(d) (2007) provides the following in relevant part:

> Upon application of a public utility that supplies electricity to the public, and notification of its customers, the commission, after an evidentiary hearing, may allow payments made by the public utility to nonfossil fuel producers for firm capacity and related revenue taxes to be recovered by the public utility through an interim increase in rates until the effective date of the rate change approved by the commission's final decision in the public utility's next general rate proceeding under section 269-16 . . . .

[14] HRS § 269-16(b) (Supp. 2016) provides the following in relevant part:

> No rate, fare, charge, classification, schedule, rule, or practice, other than one established pursuant to an automatic rate adjustment clause previously approved by the commission, shall be established, abandoned, modified, or departed from by any public utility, except after thirty days' notice to the commission as prescribed in section 269-12(b), and prior approval by the commission for any increases in rates, fares, or charges. The commission, in its discretion and for good cause shown, may allow any rate, fare, charge, classification, schedule, rule, or practice to be established, abandoned, modified, or departed from upon notice less than that provided for in section 269-12(b). A contested case hearing shall be held

(continued . . .)

### a.   HRS § 269-27.2(d)

Sierra Club has not established that a hearing was required under HRS § 269-27.2(d).  HRS § 269-27(d) provides that the Commission may allow a public utility to impose an interim increase in rates to recover payments made to "nonfossil fuel producers for firm capacity[16] and related revenue taxes" after an evidentiary hearing.  HRS § 269-27(d) (emphasis added).[17] Sierra Club has not argued that the Commission's decision

---

(. . . continued)

> in connection with any increase in rates, and the hearing shall be preceded by a public hearing as prescribed in section 269-12(c), at which the consumers or patrons of the public utility may present testimony to the commission concerning the increase.

[15]   Based upon the cases cited by Sierra Club referencing the Hawai'i Constitution, we assume that when Sierra Club references the requirements of "due process," it is to invoke the due process protections of the Constitution of the State of Hawai'i.  Article I, section 5 of the Hawai'i Constitution provides the following:

> No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

[16]   "'Firm capacity' means the scheduled amounts of capacity in kilowatts (kw) which a qualifying facility has a legally enforceable obligation to make available to an electric utility under utility dispatch within particular time periods, and which the electric utility agrees to accept."  HAR § 6-74-1 (1998).

[17]   See also S. Stand. Comm. Rep. No. 1959, in 1988 Senate Journal, at 861 ("Under current law and practice, electric utilities are not permitted to recover firm capacity payments actually being made to non-utility energy producers until the electric utility's next rate case.  This bill would provide the PUC the discretion to allow the electric utility to recover the firm capacity payments on an interim basis until the electric utility's next rate case.").

authorized Maui Electric to impose an interim increase in rates for the purpose of recovering payments for firm capacity, nor has Sierra Club argued that Maui Electric ever sought permission to do so. Indeed, the record indicates that one of the features of the Agreement was to eliminate the capacity payments that Maui Electric was paying to HC&S under the existing agreement.[18] Accordingly, the requirement of a hearing provided for in HRS § 269-27(d) is not applicable to the Application in this case.

### b. HRS § 269-16(b)

Sierra Club also failed to demonstrate that a hearing was required under HRS § 269-16(b). HRS § 269-16(b) requires the Commission to conduct a contested case hearing whenever a utility seeks an increase in rates. This provision specifically exempts fee adjustments "established pursuant to an automatic rate adjustment clause previously approved by the commission."[19] HRS § 269-16(b). In this case, the Commission authorized Maui Electric to recover charges for purchased energy under the Agreement through Maui Electric's existing energy cost

---

[18] It is noted that the nonexistence of a "firm capacity" provision in an agreement is not dispositive of whether a public utility seeks to recover such payments through an increase in rates.

[19] A "fuel adjustment clause" is defined as "a provision of a rate schedule which provides for increases or decreases or both, without prior hearing, in rates reflecting increases or decreases or both in costs incurred by an electric or gas utility for fuel and purchased energy due to changes in the unit cost of fuel and purchased energy." HAR § 6-60-6.

20

adjustment clause.[20]  There is nothing in the record indicating that Maui Electric's energy cost adjustment clause was not previously approved by the Commission or that the Commission's decision revised the existing adjustment clause.  Additionally, the record does not suggest that the use of the fuel adjustment clause in this case would cover anything other than increases or decreases in the unit cost of purchased energy determined by the last rate case proceeding for the utility.  See HAR § 6-60-6(3).  Accordingly, Sierra Club has not established that a ratemaking hearing was required under HRS § 269-16(b) before the Commission could approve Maui Electric's request to recover the purchased energy costs through its existing energy cost adjustment clause.

### c.   Due Process

#### i.   Property Interests

We next consider whether Sierra Club was entitled to a hearing pursuant to the Hawai'i Constitution's due process protections.  We have long recognized that "[c]onstitutional due process protections mandate a hearing whenever the claimant seeks to protect a 'property interest,' in other words, a benefit to which the claimant is legitimately entitled."  Pele Def. Fund v. Puna Geothermal Venture, 77 Hawai'i 64, 68, 881 P.2d

---

[20]    The Agreement defined "Energy Cost Adjustment Clause" as, "The provision in Maui Electric's rate schedules that allows Maui Electric to pass through to its customers Maui Electric's cost of fuel and purchased power."

1210, 1214 (1994). We apply a two-step analysis to claims of a due process right to a hearing: "(1) is the particular interest which claimant seeks to protect by a hearing 'property' within the meaning of the due process clauses of the federal and state constitutions, and (2) if the interest is 'property,' what specific procedures are required to protect it." Sandy Beach Def. Fund v. City Council of Honolulu, 70 Haw. 361, 376, 773 P.2d 250, 260 (1989) (citing Aguiar v. Haw. Hous. Auth., 55 Haw. 478, 495, 522 P.2d 1255, 1266 (1974)). Accordingly, in order for procedural due process protections to apply, Sierra Club "must possess an interest which qualifies as 'property' within the meaning of the constitution." Id. "These interests-- property interests--may take many forms" because courts have long recognized that "property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." Bd. of Regents v. Roth, 408 U.S. 564, 571- 72, 576 (1972). A property interest does not need to be "tangible" to be protected by the due process clause. Rather, a protected property interest exists in a benefit--tangible or otherwise--to which a party has "a legitimate claim of entitlement." Sandy Beach Def. Fund, 70 Haw. at 377; 773 P.2d at 260 (quoting Roth, 408 U.S. at 577); see also Alejado v. City & Cty. of Honolulu, 89 Hawai'i 221, 227, 971 P.2d 310, 316 (App. 1998). We have thus recognized protected property interests in

a range of intangible entitlements, including driving privileges, Kernan v. Tanaka, 75 Haw. 1, 22, 856 P.2d 1207, 1218 (1993), and the continued practice of medicine at a publicly funded hospital, Silver v. Castle Mem'l Hosp., 53 Haw. 475, 486, 497 P.2d 564, 572 (1972).

The legitimate claims of entitlement that constitute property interests are not created by the due process clause itself.  Instead, "they are created and their dimensions are defined by existing rules or understanding that stem from an independent source such as state law--rules or understanding that secure certain benefits and that support claims of entitlement to those benefits."  In re 'Īao Ground Water Mgmt. Area High-Level Source Water Use Permit Applications, 128 Hawai'i 228, 241, 287 P.3d 129, 142 (2012) [hereinafter 'Īao] (quoting Int'l Broth. of Painters & Allied Trades v. Befitel, 104 Hawai'i 275, 283, 88 P.3d 647, 655 (2004)).

In 'Īao, for example, we held that Native Hawaiian water rights constituted "'property interests' for the purpose of due process analysis."  Id. at 241-44, 287 P.3d at 142-45. The 'Īao court rejected the argument that Native Hawaiian practices are similar to general "'aesthetic and environmental interests' which the court has held to be insufficient to establish a property interest" because those affected had a genuine interest in the water at issue and there was independent

23

legal authority to support the asserted property interest.  Id.
at 242, 287 P.3d at 143.

Similar to the Native Hawaiian water rights asserted
in 'Īao, Sierra Club's asserted property interest is defined by
State constitutional and statutory law.  "The right to a clean
and healthful environment" is a substantive right guaranteed to
each person by article XI, section 9 of the Hawai'i Constitution:

> Each person has the right to a clean and healthful
> environment, as defined by laws relating to environmental
> quality, including control of pollution and conservation,
> protection and enhancement of natural resources.

Haw. Const. art. XI, § 9; see also Cty. of Haw. v. Ala Loop
Homeowners, 123 Hawai'i 391, 409, 417, 235 P.3d 1103, 1121, 1127
(2010) (recognizing a substantive right to a clean and healthful
environment).  Article XI, section 9 is self-executing, and it
"establishes the right to a clean and healthful environment, 'as
defined by laws relating to environmental quality.'"[21]  Ala Loop,
123 Hawai'i at 417, 235 P.3d at 1127.  This substantive right is
a legitimate entitlement stemming from and shaped by independent

---

[21]    In addition to the substantive right to a clean and healthful
environment, article XI, section 9 also includes a private right of
enforcement of the right to a clean and healthful environment.  See Haw.
Const. art. XI, § 9 ("Any person may enforce this right against any party,
public or private, through appropriate legal proceedings, subject to
reasonable limitations and regulation as provided by law."); Ala Loop, 123
Hawai'i at 409, 235 P.3d at 1121 (distinguishing between the substantive right
and procedural component of article XI, section 9).

sources of state law, and is thus a property interest protected by due process.

Although a person's right to a clean and healthful environment is vested pursuant to article XI, section 9, the right is defined by existing law relating to environmental quality. A committee report from the 1978 Constitutional Convention explained that the right would be defined by environmental statutes, rules, and ordinances to lend flexibility to the definition of the right over time:

> Your Committee believes that a clean and healthful environment is an important right of every citizen and that this right deserves constitutional protection. The definition of this right would be accomplished by relying on the large body of statutes, administrative rules and ordinances relating to environmental quality. Defining the right in terms of present laws imposes no new legal duties on parties, a point of fairness important to parties which have invested or are investing large sums of money to comply with present laws.
>
> Developing a body of case law defining the content of the right could involve confusion and inconsistencies. On the other hand, legislatures, county councils and administrative agencies can adopt, modify or repeal environmental laws or regulation laws [sic] in light of the latest scientific evidence and federal requirements and opportunities. Thus, the right can be reshaped and redefined through statute, ordinance and administrative rule-making procedures and not inflexibly fixed.

Ala Loop, 123 Hawaiʻi at 409 n.24, 235 P.3d at 1121 n.24 (emphases added) (quoting Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of Hawaiʻi 1978, at 689). Accordingly, the parameters of the property interest asserted by Sierra Club under article XI, section 9 is defined in reference to laws related to environmental quality. See id.

25

Sierra Club has asserted a right to a clean and healthful environment in this case as defined by HRS Chapter 269, which includes the duties and operation of the Commission in regulating public utilities. Thus, we next consider whether Chapter 269 is a law relating to environmental quality within the meaning of article XI, section 9. HRS § 269-6 pertains to the general powers and duties of the Commission and prescribes that the Commission "shall consider the need to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation." HRS § 269-6(b) (Supp. 2013).[22] This statutory provision also provides that in its decision-making, the Commission "shall explicitly consider" the effect of the State's reliance on fossil fuels on the level of "greenhouse gas emissions." Id. Indeed, dating back as far as 1977, when the legislature adopted HRS § 269-27.2 concerning the

---

[22]     HRS § 269-6(b) provides the following:

> The public utilities commission shall consider the need to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation in exercising its authority and duties under this chapter. In making determinations of the reasonableness of the costs of utility system capital improvements and operations, the commission shall explicitly consider, quantitatively or qualitatively, the effect of the State's reliance on fossil fuels on price volatility, export of funds for fuel imports, fuel supply reliability risk, and greenhouse gas emissions. The commission may determine that short-term costs or direct costs that are higher than alternatives relying more heavily on fossil fuels are reasonable, considering the impacts resulting from the use of fossil fuels.

utilization of electricity generated from nonfossil fuels, the legislature has repeatedly communicated its intent that the Commission is to reduce the State's dependence on fossil fuels and utilize renewable energy sources. This intent is manifest in the legislative history of Chapter 269, which unequivocally demonstrates an established State policy of prioritizing the utilization of renewable energy sources to reduce pollution in addition to securing the potential economic benefits and enhanced reliability of the State's energy supply.

HRS § 269-6(b) was permissive when first enacted in 2007: "The public utilities commission may consider the need for increased renewable energy use in exercising its authority and duties under this chapter." 2007 Haw. Sess. Laws Act 177, § 2 at 346. The 2007 act noted that "[p]rogressive energy policy-making at the state level [was] one of the most important issues on the [2007] legislative agenda." Id. § 1 at 345-46. One of the purposes of the 2007 legislation was to authorize the Commission "to consider the need for increased renewable energy use in exercising its authority and duties" under Chapter 269. Id. This addition to Chapter 269 was unsurprising given the legislature's establishment of renewable portfolio standards in

2001.[23]  The renewable portfolio standards clarify what qualifies as renewable energy.[24]  In further clarifying what qualified as renewable energy in 2004, the legislature found that "the State should be a strategic partner with the private sector in developing these renewable energy resources, and that the State's willingness and intent to provide relevant and meaningful support for this endeavor should be embedded into public policy."  2004 Haw. Sess. Laws Act 95, § 1 at 384.

In 2011, the legislature amended HRS § 269-6(b) to make it <u>mandatory</u> for the Commission when exercising its duties to recognize the "need" to reduce reliance on fossil fuels and to "explicitly consider" the levels and effect of greenhouse gas emissions:

> (b) The public utilities commission [may] <u>shall</u> consider the need [for] <u>to reduce the State's reliance on fossil fuels through energy efficiency and</u> increased renewable energy [use] <u>generation</u> in exercising its authority and duties under this chapter.  <u>In making determinations of the reasonableness of the costs of utility system capital improvements and operations, the commission shall explicitly consider, quantitatively or qualitatively, the effect of the State's reliance on fossil fuels on price volatility, export of funds for fuel imports, fuel supply reliability risk, and greenhouse gas emissions.  The commission may determine that short term costs or direct costs that are higher than alternatives relying more heavily on fossil fuels are reasonable, considering the impacts resulting from the use of fossil fuels.</u>

---

[23]  Act 272 (June 25, 2001) (adopting renewable portfolio standards and noting the "intent of the legislature to recognize the economic, environmental, and fuel diversity benefits of renewable energy resources").

[24]  See HRS §§ 269-91, 269-92.

2011 Haw. Sess. Laws Act 109, § 1 at 287-88 (repealed statutory material bracketed and stricken, and new statutory material underscored). The House Committee on Energy and Environmental Protection made the following finding with respect to the 2011 amendment:

> Your Committee finds that Hawaii is dangerously reliant on imported fossil fuel, which subjects the State and residents to greater oil and gas price volatility, increased air pollution, and potentially harmful climate change due to the release of harmful greenhouse gases. Your Committee further finds that these adverse conditions carry with them hidden costs that are not always considered by the Public Utilities Commission when the Commission makes decisions regarding utility system capital improvements and operations. This measure will assist in reducing the State's reliance on fossil fuels by requiring the Commission to factor in the hidden and long-term costs of the State's detrimental reliance on fossil fuels when exercising its statutory authority.

H. Stand. Comm. Rep. No. 1004, in 2011 House Journal, at 1332 (emphases added). Thus, a primary purpose of the amended law was to require the Commission to consider the hidden and long-term costs of reliance on fossil fuels, which subjects the State and its residents to "increased air pollution" and "potentially harmful climate change due to the release of harmful greenhouse gases." Id.

HRS § 269-6(b)'s requirement to reduce reliance on fossil fuels and to consider greenhouse gas emissions applies to the fulfillment of all of the Commission's duties. See HRS § 269-6(b). Chapter 269 also includes HRS § 269-27.2, concerning the utilization of electricity generated from nonfossil fuels, and Part V, prescribing renewable portfolio standards. These

regulations would appear to be precisely the type of "laws relating to environmental quality" that article XI, section 9 references.

The dissent presents three interrelated arguments that Sierra Club does not possess a protected interest in a clean and healthful environment as defined by HRS Chapter 269.[25]  First, the dissent contends that HRS § 269-6, HRS § 269-27.2, and Part V of HRS Chapter 269 do not "provide Sierra Club's Members or others with a protected property interest."  Dissent at 13. Second, the dissent argues that article XI, section 9 of the Hawai'i Constitution does not create a property interest. Dissent at 15.  Lastly, the dissent contends that HRS Chapter 269 does not describe property interests and appears to reason, therefore, that the chapter cannot define the contours of the property interest created by article XI, section 9.  Dissent at 13, 16.

The dissent's initial argument that HRS Chapter 269 does not "provide" anyone "with a protected property interest" misapprehends the source of Sierra Club's protected interest in

_____

[25]     Notwithstanding the dissent's claim that article XI, section 9 does not create a protected interest, the dissent also suggests that the private declaratory action that article XI, section 9 authorizes is the exclusive procedural mechanism for protecting the interest the provision creates.  Dissent at 17-18.  The procedural measures our Constitution affords to protect against the wrongful deprivation of an interest are a wholly separate question from whether a protected interest exists in the first instance.  We therefore address this contention infra when considering the procedural protections Sierra Club is due.

a clean and healthful environment.  It is not necessary for HRS Chapter 269 to <u>create</u> a property interest because article XI, section 9 has already done so, as explained next with regard to the dissent's second contention.

The dissent's second argument that article XI, section 9 of the Hawaiʻi Constitution does not create a protected property interest is plainly contradicted by the history of our Constitution and this court's own precedent.  The Standing Committee Report from the 1978 Constitutional Convention specifically observed that "a clean and healthful environment is an <u>important right of every citizen</u> and that this right deserves constitutional protection."  Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of Hawaiʻi of 1978, at 689 (emphasis added).  And the resolution adopting the amendment stated that the provision "gives each person the right to a clean and healthful environment as defined by law."  Res. 30, in 1 Proceedings of the Constitutional Convention of Hawaiʻi of 1978, at 543-44.  Indeed, we expressly recognized in <u>Ala Loop</u> that article XI, section 9 "recognizes a <u>substantive</u> right." 123 Hawaiʻi at 409, 235 P.3d at 1121 (emphasis added).

The dissent, in contending that section 9 does not create a protected property interest, also appears to differentiate substantive rights from property interests by

31

arguing that Ala Loop "did not indicate that plaintiffs had a property interest." Dissent at 15. The distinction is unfounded. As stated, a property interest exists wherever there is a "legitimate claim of entitlement" that "stem[s] from an independent source such as state law--rules or understandings that secure certain benefits." 'Īao, 128 Hawai'i at 241, 287 P.3d at 142 (quoting Int'l Broth. of Painters, 104 Hawai'i at 283, 88 P.3d at 655). Thus, where a source of state law--such as article XI, section 9--grants any party a substantive right to a benefit--such as a clean and healthful environment--that party gains a legitimate entitlement to that benefit as defined by state law, and a property interest protected by due process is created. In other words, the substantive component of article XI, section 9 that we recognized in Ala Loop is a protectable property interest under our precedents.[26]

Lastly, the dissent contends that "[u]nlike the statutes in 'Īao which described Native Hawaiians' entitlement to water," HRS Chapter 269 does not "describe[] . . . property interests" that "establish the content of the substantive right to a clean and healthful environment." Dissent at 16. Article

---

[26] Indeed, by acknowledging that article XI, section 9 provides Sierra Club with the procedural right to bring a private declaratory action to enforce HRS Chapter 269, Dissent at 17-18, the dissent also implicitly acknowledges that there is a substantive right--and thus a property interest--that would be vindicated through such a private action.

XI, section 9, however, expressly defines the contours of "a clean and healthful environment" through "laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources." That is, the property interest created by article XI, section 9 is shaped by <u>all</u> state laws relating to environmental quality. <u>See</u> Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 689 ("The definition of this right [to a clean and healthful environment] would be accomplished by relying on the large body of statutes, administrative rules and ordinances relating to environmental quality."). Article XI, section 9 thus guarantees to "[e]ach person" an individual, private right to share in the benefit of environmental laws--regardless of whether the regulation describes a "tangible property interest."[27]

Additionally, the dissent mischaracterizes the property rights at issue in 'Īao as being specifically provided for by statute. Dissent at 16. However, the provisions of the water code relating to Native Hawaiian water rights that we considered were styled as <u>savings clauses</u>, stating that the

_____

[27] It is noted that such environmental laws may be enacted pursuant to article IX, section 8, which empowers the State to pass environmental regulations "to promote and maintain a healthful environment."

water code was not intended to abridge rights already in existence.[28] The water rights were derived from other sources of law, including traditional practices and article XII, section 7 of our Constitution, which guarantees "all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians." See 'Īao, 128 Hawai'i at 263, 287 P.3d at 164 (Acoba, J., concurring). Thus, the statutes at issue in 'Īao specifically preserved "all rights" guaranteed by article XII, section 7, while in this case HRS Chapter 269 defines the contours of the "right" of "each person . . . to a clean and healthful environment" that article XI, section 9 guarantees. Both statutes clarify the content of rights guaranteed by the respective constitutional provisions, which are protectable interests under the due process clause.

We therefore conclude that HRS Chapter 269 is a law relating to environmental quality that defines the right to a clean and healthful environment under article XI, section 9 by providing that express consideration be given to reduction of greenhouse gas emissions in the decision-making of the

---

[28] See HRS § 174C-101(c)-(d) (2012) ("Traditional and customary rights . . . shall not be abridged or denied by this chapter. . . . The appurtenant water rights . . . shall not be diminished or extinguished . . . under this chapter." (emphases added)).

Commission.  Accordingly, we hold that Sierra Club has established a legitimate claim of entitlement to a clean and healthful environment under article XI, section 9 and HRS Chapter 269.

We note that this right is not a freestanding interest in general aesthetic and environmental values.  See Sandy Beach Def. Fund, 70 Haw. at 376-77, 773 P.2d at 260-61.  The challengers in Sandy Beach Defense Fund did not identify any source granting them a substantive legal right to enforcement of environmental laws.  Rather, the asserted "property interests" were unilateral expectations of aesthetic value, including claims that a person who lived in close proximity to a proposed development would lose her view of the ocean and decrease the value of her property.  Id. at 367, 773 P.2d at 255.  In contrast, Sierra Club's right to a clean and healthful environment is provided for in article XI, section 9 of the Hawai'i Constitution and defined by HRS Chapter 269.  It is not a unilateral expectation on the part of Sierra Club, but rather a right guaranteed by the Constitution and statutes of this state.

## ii.  Hearing Procedures

Having determined that Sierra Club has established a protectable "property" interest, we next consider what procedures due process requires in this case given the demonstrated property interest in a clean and healthful

environment as defined by HRS Chapter 269. In determining the procedures required to comply with constitutional due process, we consider the following factors: "(1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative procedural safeguards; and (3) the governmental interest, including the burden that additional procedural safeguards would entail." Sandy Beach Def. Fund v. City Council of City & Cty. of Honolulu, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989); see also Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawai'i 376, 410, 363 P.3d 224, 258 (2015) (Pollack, J., concurring). We have held that, "as a matter of constitutional due process, an agency hearing is . . . required where the issuance of a permit implicating an applicant's property rights adversely affects the constitutionally protected rights of other interested persons who have followed the agency's rules governing participation in contested cases." Pele Def. Fund v. Puna Geothermal Venture, 77 Hawai'i 64, 68, 881 P.2d 1210, 1214 (1994). In other words, the court in Pele Defense Fund concluded that when the requirements of standing were met and the agency's rules were followed, an agency hearing was required when the challenged State action "adversely affects the constitutionally protected rights" of

others.  Id. (citing other subsections of the opinion addressing the requirements of standing and compliance with agency rules).

As discussed, the private interest to be affected in this case is the right to a clean and healthful environment, which is a substantive right guaranteed by the Hawai'i Constitution.  See Cty. of Haw. v. Ala Loop Homeowners, 123 Hawai'i 391, 409, 417, 235 P.3d 1103, 1121, 1127 (2010).[29]  This right to a clean and healthful environment includes the right that explicit consideration be given to reduction of greenhouse gas emissions in Commission decision-making, as provided for in HRS Chapter 269.  In this case, Maui Electric sought approval of a power purchase agreement with an energy producer that relies on the burning of coal and petroleum in its operations and has been charged with violation of the State's visible emissions standards.[30]  The approval of Maui Electric's Application not only involved the approval of a newly negotiated power-purchase agreement, but it also extended Maui Electric's reliance on HC&S for an additional three years.  The Commission was statutorily

_____

[29]    Thus, contrary to the dissent's characterization, Dissent at 8, the protectable interest in this case for the purpose of constitutional due process is not the abstract aesthetic and environmental interests of Sierra Club's members; it is the right to a clean and healthful environment guaranteed by article XI, section 9 of the Hawai'i Constitution and particularized by HRS Chapter 269.  This decision does not encompass all general environmental and aesthetic interests.

[30]    See supra notes 4 and 7.

required to consider the hidden and long-term costs of the continued reliance on energy produced at the Pu'unene Plant, including the potential for increased air pollution as a result of greenhouse gas emissions.  The Commission was requested in the Application to consider the reasonableness of the energy charges and determine whether the arrangement between Maui Electric and HC&S was prudent and in the public interest.  A review of the Agreement would involve a consideration of the level of emissions, and axiomatic in this analysis is the implied consideration of potential risks to health, as contemplated by the legislature when it amended HRS § 269-6(b) in 2011, see supra.  Indeed, the consideration of whether energy charges are reasonable or whether a business arrangement is prudent would necessarily include an evaluation of the hidden and long-term costs of the activities of the Pu'unene Plant.  The Commission's determinations of these matters would bear upon the level of emissions generated by the Pu'unene Plant, thus affecting Sierra Club's members' right to a clean and healthful environment as defined by HRS Chapter 269.

Given the issues raised by Maui Electric's Application, the proceedings directly affected the right to a clean and healthful environment of Sierra Club's members as defined by HRS Chapter 269.  This is evident, not only from the issues raised in the Application, but also from the findings and

38

conclusions of the Commission in its Decision and Order,

granting the Application for approval of the Agreement.  For

example, the Commission specifically concluded that the

Agreement--under which Maui Electric would continue to purchase

energy generated at a plant that burned fuels that included coal

and petroleum--was "anticipated to help accomplish the State's

policy goals of reaching 100% renewable energy by 2045 as well

as increasing the State's energy self-sufficiency."[31]

Additionally, in filing its quarterly report setting forth the

type of energy purchased, the associated payment, and the type

of fuel burned by HC&S, the Commission allowed Maui Electric to

keep the fuel information confidential.[32]  Therefore, the

Commission's Decision and Order specifically involved

determinations related to the State's renewable energy goals as

_____

[31]     The Commission did not provide a rationale for this conclusion, which is contrary to the Consumer Advocate's position that "continued reliance on older thermal units that burn fossil fuels is not consistent with the State's goal of 100% renewable energy by 2045."  See supra note 4.

[32]     The Commission in its Decision and Order indicated that Maui Electric failed to provide an explanation as to why this information should be confidential but noted that Maui Electric previously took the position that such information is HC&S's "confidential and proprietary information, which, if disclosed publicly, could disadvantage and competitively harm" HC&S.  Neither the Commission nor Maui Electric explained why this information--which was previously not treated as confidential, proprietary information by Maui Electric--should be treated as such under the Agreement. See, e.g., Motion to Seal of Maui Electric Company, Limited Dkt. No. 2011-0092, Exhibit F at 19 (Sept. 6, 2013) (disclosing HC&S's energy generation by source percentage while redacting other information designated as confidential pursuant to a protective order).  In its motion to intervene or to participate without intervention, Sierra Club provided this information for the years 2010 to 2012 as a basis for its motion.

set out in HRS Chapter 269, and, by extension, the Commission's decision also involved a determination of Sierra Club's members' interest in a clean and healthful environment as defined by HRS Chapter 269.

Accordingly, the Commission's approval of the Agreement under the terms of its Decision and Order adversely affected the private interests of Sierra Club's members. The risks of an erroneous deprivation are high in this case absent the protections provided by a contested case hearing, particularly in light of the potential long-term impact on the air quality in the area, the denial of Sierra Club's motion for intervention or participation in the proceeding, and the absence of other proceedings in which Sierra Club could have a meaningful opportunity to be heard concerning HC&S's performance of the Agreement. Additionally, given that the Commission is already statutorily required to consider the long-term effects of its decisions, it would not unduly burden the Commission to afford Sierra Club a contested case hearing under the circumstances of this case. See Mauna Kea, 136 Hawai'i at 390, 363 P.3d at 238 (concluding that due process required a hearing "[g]iven the substantial interest of Native Hawaiians in pursuing their cultural practices on Mauna Kea, the risk of an erroneous deprivation absent the protections provided by a contested case hearing, and the lack of undue burden on the

government in affording Appellants a contested case hearing").
In its order denying Sierra Club's motion for intervention or
participation, the Commission noted that it allowed Sierra Club
to participate in other energy proceedings, which further
indicates that affording Sierra Club a hearing regarding the
Application's adverse effect on its members' right to a clean
and healthful environment would not unduly burden the
Commission.

The dissent states that "it appears that Ala Loop
would give Sierra Club the ability to bring a separate
declaratory judgment action alleging that the PUC failed to
comply with its statutory duties under HRS § 269-6" and thus
Sierra Club would not be deprived of any recourse if it does not
have a constitutional right to intervene.  Dissent at 17-18.
The dissent maintains that this is a "more nuanced approach" to
defining article XI, section 9, which would avoid an "all or
nothing" interpretation of the provision.  Dissent at 18.  But
it is the "nuanced" approach of the dissent that takes the
uncompromising position that the exclusive procedural mechanism
for protecting an interest derived from article XI, section 9 is
the private declaratory action that the provision authorizes.
Dissent at 17-18.  The dissent's contention is not supported by
the wording of article XI, section 9, which contains no such
exclusivity language, nor by the due process clause of our

Constitution, whose protections are not restricted by the right to pursue a declaratory action.

By way of analogy, in Brown v. Thompson, the State impounded two unattended boats and disposed of them after determining that they were derelict. 91 Hawai'i 1, 5-7, 979 P.2d 586, 590-92 (1999). Just as here, there was no dispute that the owner of the boat had the procedural right to bring a private action for declaratory relief. (Indeed, Brown originated as just such an action, though it was filed after the boat's disposition occurred. Id. at 7, 979 P.2d at 592.) We nonetheless held that the disposition of an impounded vessel was an interest protected by due process under article I, section 5 of the Hawai'i Constitution, and the owner should have been afforded a hearing prior to deprivation. Id. at 12-13, 979 P.2d at 597-98. As in this case, the declaratory action in Brown simply provided one procedural route through which the owner could vindicate his protected interest. The ability to seek declaratory relief did not diminish the right to due process protection of the interest, nor did it preclude other procedural protections.

Similarly, the importance of not restricting the due process protection to the exclusivity approach advocated by the dissent is manifest in this case. A belated post-decision civil action for declaratory relief is not a replacement for

42

participation in a hearing before the PUC, and it does not

eliminate the risk of wrongful deprivation.[33]  Short of the

"extraordinary remedy" of a preliminary injunction, Morgan v.

Planning Dep't, Cty. of Kauai, 104 Hawaiʻi 173, 188, 86 P.3d 982,

997 (2004), an administrative decision may go into effect during

the pendency of a suit for declaratory relief.  This is of

particular concern in the context of environmental regulations,

where the damage caused by a violation is not easily reversed.

And requiring relitigation of agency decisions is inefficient

and imposes an increased burden on the State in contrast to

resolving the challenge in the initial decision-making process.

Brown, 91 Hawaiʻi at 12, 979 P.2d at 597 (concluding that "the

additional safeguard of a hearing would not significantly

increase the burden on the state"); see also Sandy Beach Def.

_____

[33]    The dissent contends that by holding that due process provides
for participation in a hearing, we are making "a policy argument" and
supplanting "the legislature's role by making our own policy decisions."
Dissent at 17 n.9 (quoting Konno v. Cty. of Haw., 85 Hawaiʻi 61, 75, 937 P.2d
397, 411 (1997)).  The dissent incorrectly conflates the substantive right
granted by article XI, section 9, which is intended to be established through
environmental legislation, with the procedures by which that right is
enforced.  The minimum procedural protections that must be afforded before a
party may be deprived of an interest protected by due process are a matter of
constitutional law derived from our interpretation of article I, section 5--
not policy judgments.  "Our ultimate authority is the Constitution; and the
courts, not the legislature, are the ultimate interpreters of the
Constitution."  State v. Bani, 97 Hawaiʻi 285, 291 n.4, 36 P.3d 1255, 1261 n.4
(2001) (quoting State v. Nakata, 76 Hawaiʻi 360, 370, 878 P.2d 699, 709
(1994)); see also State v. Quitog, 85 Hawaiʻi 128, 130 n.3, 938 P.2d 559, 561
n.3 (1997) (recognizing the Hawaiʻi Supreme Court as "the ultimate judicial
tribunal with final, unreviewable authority to interpret and enforce the
Hawaiʻi Constitution" (quoting State v. Arceo, 84 Hawaiʻi 1, 28, 928 P.2d 843,
870 (1996))).

Fund, 70 Haw. at 378, 773 P.2d at 261 (stating that evaluation of whether procedures are required by due process requires weighing the risk of an erroneous deprivation and the probable value of alternative procedural safeguards against the burden on the State).  Constitutional due process calls for a far more flexible measure of protection than the one-size-fits-all approach advocated by the dissent.  See Sandy Beach Def. Fund, 70 Haw. at 378, 773 P.2d at 261 ("Due process is not a fixed concept requiring a specific procedural course in every situation.  '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972) (alteration in original))).

We also do not agree with Maui Electric, the Commission, and the dissent's assertion that only those living adjacent to the Pu'unene Plant would be able to demonstrate a protectable property interest in this case.  Dissent at 10. While proximity to the property at issue may be relevant, there is no requirement in our law that a person must be living adjacent to physical property in order to be adversely affected by the use of that property.  Instead, we consider whether a protected property right has been adversely affected.  See Pele Def. Fund, 77 Hawai'i at 68, 881 P.2d at 1214; Life of the Land v. Land Use Comm'n, 63 Haw. 166, 176-77, 623 P.2d 431, 441

44

(1981) (holding environmental organization "and its members have a 'stake' in the outcome of the alleged controversy adequate to invoke judicial intervention, <u>even though they are neither owners nor adjoining owners of land</u>" because article XI, section 9 recognizes environmental interests "as personal and special interests or 'rights'" (emphasis added)).

The United States Supreme Court discussed the issue of interstate air pollution in a recent decision:

> Pollutants generated by upwind sources are often transported by air currents, sometimes over hundreds of miles, to downwind States.  As the pollution travels out of state, upwind States are relieved of the associated costs. Those costs are borne instead by the downwind States, whose ability to achieve and maintain satisfactory air quality is hampered by the steady stream of infiltrating pollution.

<u>E.P.A. v. EME Homer City Generation, L.P.</u>, 134 S. Ct. 1584, 1592 (2014).  Indeed, it is commonly understood that "[a]ir pollution is transient" and is "heedless" of even "state boundaries."  <u>Id.</u> Accordingly, those who are adversely affected by greenhouse gas emissions produced by the burning of fossil fuels may not necessarily be limited to those who live in the areas immediately adjacent to the source of the emissions.[34]

---

[34]    As stated earlier, HC&S agreed to a Consent Order for alleged emissions violations at the Puʻunene Plant, which included a requirement that HC&S monitor the air quality at local schools.  <u>See</u> <u>supra</u> note 7.  It is noted that three of the five proposed schools for air monitoring are located between nine and eleven miles from the Puʻunene Plant.  <u>See</u> <u>Dep't of Health v. Hawaiian Commercial & Sugar Co.</u>, 14-CA-EO-01 (June 7, 2016), <u>available at</u> http://health.hawaii.gov/cab/files/2016/06/2016_06_07__No._14-CA-EO-01-HCS-CO-signed-by-DDEH.pdf.  A map of the County of Maui is available through the County of Maui website.  Land Permit Map Viewer, County of Maui Hawaii,

(continued . . .)

By extension, the fact that HC&S was already burning fossil fuels does not mean that the continued burning of fossil fuel--and subsequent release of additional emissions into the air--is not sufficient to demonstrate an adverse effect on the right to a clean and healthful environment.[35]  The fact that there was a preexisting agreement between Maui Electric and HC&S does not exempt Maui Electric's Application from the State's established policies regarding greenhouse gas emissions and renewable energy as set out in HRS Chapter 269.  Indeed, many of Chapter 269's safeguards did not exist at the time that the pre-existing agreement was initially reviewed by the Commission in 1990.  However, regardless of whether there was an existing agreement pursuant to which Maui Electric and HC&S could have continued to operate, Maui Electric sought the Commission's approval of a newly negotiated agreement that was subject to all the requirements of HRS Chapter 269.  As discussed, the consideration of whether energy charges are reasonable or a

---

(. . . continued)

http://www.co.maui.hi.us/80/Land-Permit-Map-Viewer (last visited Dec. 9, 2016).

[35]     Relatedly, Maui Electric's assertion that its Application only concerns the "business terms" of the Agreement and would have little to no impact on how the energy is generated is unsupported by the record.  For example, the Commission's Decision and Order notes that the decrease in regularly scheduled energy from HC&S may result in the reactivation of Maui Electric's older power plants that run on fossil fuels.

business arrangement is prudent would necessarily involve an evaluation of the hidden and long-term costs of the activities of the Pu'unene Plant, including consideration of the potential for harmful greenhouse gas emissions.  The Commission's assertion that "environmental preferences and concerns as to air quality" "are beyond the scope of Chapter 269" are directly contradicted by Chapter 269,[36] the legislative history of Chapter 269,[37] and the Commission's own Decision and Order in this case.[38]

We conclude that, under the circumstances of this case, the protected property interest in a clean and healthful environment asserted by Sierra Club necessitated a hearing by the Commission to consider the impacts of approving the Agreement on Sierra Club's members' right to a clean and

---

[36]    As discussed, under HRS Chapter 269, the Commission has an affirmative duty "to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation."  HRS § 269-6(b).  In doing so, the Commission must "explicitly consider" the effect of the State's reliance on fossil fuels on the level of "greenhouse gas emissions."  Id.

[37]    As discussed, the legislative history of HRS Chapter 269 overwhelmingly demonstrates an established State policy of prioritizing the utilization of renewable energy sources to reduce greenhouse gas emissions in addition to the potential economic benefits and enhanced reliability of the State's energy supply.  See supra.

[38]    In its Decision and Order, the Commission specifically cites the State's energy policy objectives and renewable energy goals, discusses the compelling need to reduce reliance on Maui Electric's older plants that rely on fossil fuels, and notes that HC&S also may need to resort to burning fossil fuels to meet its obligations under the Agreement.  Accordingly, the Commission required Maui Electric to report quarterly with information regarding the reactivation of Maui Electric's older power plants and the type of fuel burned by HC&S to meet its obligations under the agreement.

healthful environment, including the release of harmful
greenhouse gases by the Puʻunene Plant that would result from the
Agreement, whether the cost of the energy under the Agreement
was reasonable in light of the potential for harmful emissions,
and whether the terms of the Agreement were prudent in light of
the potential hidden and long-term consequences of the
Agreement.[39]

"We observe that procedural due process requires that
a person have an 'opportunity to be heard at a meaningful time
and in a meaningful manner.'" Freitas v. Admin. Dir. of Courts,
108 Hawaiʻi 31, 44, 116 P.3d 673, 686 (2005) (quoting Farmer v.
Admin. Dir. of the Courts, 94 Hawaiʻi 232, 238, 11 P.3d 457, 463
(2000)). This includes the right to submit evidence and
argument on the issues--in this case the relevant issue being
the impact of the Agreement on the asserted property interest.
See Application of Haw. Elec. Light Co., 67 Hawaiʻi 425, 430, 690
P.2d 274, 278 (1984). Although the parties have the right to

---

[39]    Thus, the ICA erred in concluding that the Commission was not
required by law to hold a hearing on Maui Electric's Application.
Accordingly, In re Tawhiri Power LLC, 126 Hawaiʻi 242, 269 P.3d 777 (App.
2012), is not applicable to this case.

The dissent asserts that our opinion may have unintended
consequences elsewhere, such as in other situations where the legislature has
mandated consideration of specific factors by executive agencies when
implementing a statute. Dissent at 14. However, it is not the mandated
consideration by executive agencies that creates a property interest;
instead, it is the constitutional guarantee set forth in article XI, section
9 and particularized by HRS Chapter 269 that defines the protectable property
interest to a clean and healthful environment.

present evidence, cross-examine opposing evidence, and submit rebuttal evidence, "considerations of relevancy, materiality, and repetition" limit the presentation of evidence in contested case proceedings.  See id.; see also HRS § 91-10(1) (2012); Korean Buddhist Dae Won Sa Temple of Haw. v. Sullivan, 87 Hawai'i 217, 236, 953 P.2d 1315, 1334 (1998); Cazimero v. Kohala Sugar Co., 54 Haw. 479, 483, 510 P.2d 89, 92 (1973).  Accordingly, the Commission has the authority to set limitations in conducting the proceedings so long as the procedures sufficiently afford an opportunity to be heard at a meaningful time and in a meaningful manner on the issue of the Agreement's impact on the asserted property interest.

## 2. Standing

"Establishing that a contested case took place does not end the inquiry into justiciability."  Pele Def. Fund v. Puna Geothermal Venture, 77 Hawai'i 64, 69, 881 P.2d 1210, 1215 (1994).  Sierra Club must also show that it is "entitled to request a review of the agency determination."  Id. (quoting Mahuiki v. Planning Comm'n, 65 Haw. 506, 513, 654 P.2d 874, 879 (1982)).  In order to establish standing, a plaintiff must have suffered an actual or threatened injury; the injury must be fairly traceable to the defendant's actions; and a favorable decision would likely provide relief for the plaintiff's injury.  Sierra Club v. Dep't of Transp., 115 Hawai'i 299, 319, 167 P.3d

292, 312 (2007). Environmental plaintiffs must meet this three-part standing test but need not assert an injury that is different in kind from an injury to the public generally. Id. at 320, 167 P.3d at 313. We "will recognize harms to plaintiffs' environmental interests as injuries that may provide the basis for standing." Id. This lower standard that is applied when environmental rights are asserted has long been established in our law. See Application of Hawaiian Elec. Co., 56 Haw. 260, 264-65 n.1, 535 P.2d 1102, 1105-06 n.1 (1975) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." (quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 685 (1973))).

Further, we recognize that "where the interests at stake are in the realm of environmental concerns[,] 'we have not been inclined to foreclose challenges to administrative determinations through restrictive applications of standing requirements.'" Kilakila 'O Haleakala v. Bd. of Land & Nat. Res., 131 Hawai'i 193, 204, 317 P.3d 27, 38 (2013) (alteration in

original) (quoting Citizens for Prot. of N. Kohala Coastline v. Cty. of Haw., 91 Hawai'i 94, 100, 979 P.2d 1120, 1126 (1999)).

"[T]he injury prong of the standing inquiry requires an assertion of a judicially cognizable injury, that is, a harm to some legally protected interest."  Sierra Club v. Dep't of Transp., 115 Hawai'i at 321, 167 P.3d at 314.  As discussed, Sierra Club has established that its members possess a right to a clean and healthful environment under article XI, section 9 of the Hawai'i Constitution, which includes, under HRS Chapter 269, that explicit consideration be given to the reduction of the State's reliance on fossil fuels and the effects of greenhouse gas emissions in the decision-making of the Commission. Accordingly, we consider whether the affidavits of Sierra Club's members assert harm to legally protected interests in a clean and healthful environment.

The Apana and Andrews affidavits demonstrate a threatened injury to the right to a clean and healthful environment from the effect of greenhouse gas emissions.  Both affidavits explain the potential health effects of burning coal and the potential impacts of the operations of the Pu'unene Plant on Apana and Andrews's health.  The Apana affidavit states that the Commission's decision could impact the level of coal burning at the Pu'unene Plant, affecting Apana's "long-term health and well-being."  The Andrews affidavit states that "the Department

of Health issued the Pu'unene plant a Notice of Violation in 2014 and a million dollar fine regarding its emissions of opacity."[40] Andrews discloses in her Affidavit that due to her concerns about air pollution, she closes the windows at her home and runs air filters inside her house when emissions levels are high. The Andrews affidavit further expressed concern that HC&S "burns more coal and produced more air pollution in order to meet its obligations" to Maui Electric and that the Commission's decision with regard to the Application could impact her "long-term health and well-being."

Accordingly, a threatened injury to Sierra Club's members that is fairly traceable to the operations of HC&S was sufficiently established to satisfy standing. See Mottl v. Miyahara, 95 Hawai'i 381, 394, 23 P.3d 716, 729 (2001) ("[A]lthough difficult to quantify, deterioration of air quality and odor nuisance are 'distinct and palpable' injuries." (quoting Akinaka v. Disciplinary Bd. of Haw. Supreme Ct., 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999)); see also Kilakila 'O Haleakala, 131 Hawai'i at 205, 317 P.3d at 39 (concluding that the organization dedicated to the protection of the sacredness of the summit of Haleakalā had standing to pursue a HRS § 91-14

---

[40]     The Andrews affidavit indicates that "opacity is a measure of particular matter pollution."

appeal based on the threatened injury to its Native Hawaiian traditional and customary practices and its aesthetic and environmental interests in the summit area).

### III. CONCLUSION

For the reasons discussed above, a due process hearing was required to protect the asserted property right to a clean and healthful environment guaranteed by article XI, section 9 and defined by HRS Chapter 269. Accordingly, the ICA erred in determining that no appellate jurisdiction existed over Sierra Club's appeal. The ICA's January 20, 2016 "Order Granting Maui Electric Company, Ltd's November 9, 2015 Motion to Dismiss Appeal for Lack of Appellate Jurisdiction" is vacated, and the case is remanded to the ICA for further proceedings.

Kylie W. Wager and
Isaac H. Moriwake
for petitioner

Randall C. Whattoff,
James E. Abraham, and
Rebecca D. Matsushima
for respondent
Maui Electric Company, Ltd.

Mark J. Kaetsu and
Thomas C. Gorak
for respondent
Public Utilities Commission

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

